Matter of Justina R. (2004 NY Slip Op 51460(U))

[*1]

Matter of Justina R.

2004 NY Slip Op 51460(U)

Decided on November 17, 2004

Family Court, Suffolk County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 17, 2004

Family Court, Suffolk County
In 
 the matter of JUSTINA R.
B-3636/2004

Frank Krotschinsky, Esq. John B. Belmonte, Esq.
Suffolk County Attorney Legal Aid Society
Attorney For Petitioner Law Guardian
400 Carleton Avenue 400 Carleton Avenue
Central Islip NY 11722 Central Islip NY 11722
Stephen M. Hellman, Esq. Terry R. Woodard, Esq.
Attorney For Charlotte D. Attorney For Howard D.
1235 Montauk Highway 320 Carleton Avenue
Mastic NY 11950 Central Islip NY 11722

Jeffrey Arlen Spinner, J.
The Petitioner SUFFOLK COUNTY DEPARTMENT OF SOCIAL SERVICES has filed Verified Petitions pursuant to Section 384-b of the Social Services Law Of The State Of New York wherein it seeks an Order of the Court terminating the parental rights of the Respondents CHARLOTTE D. and HOWARD D. In its pleadings, the County avers that the Respondents and each of them have permanently neglected the subject child JUSTINA R. (date of birth July 4, 2002) by failing to plan for the child's future, failing to comply with prior Orders of the Court related to this child as well as her two siblings as well as by virtue of the fact that the child has been in foster care for the duration of her life. The County also seeks an Order of this Court pursuant to Family Court Act section 1039-b relieving it of any further diligent efforts to reunify [*2]the family.
 The Respondents, each appearing through separate and very capable counsel, have vigorously opposed both of the Petitioner County's application, both upon legal and factual grounds and they seek to have the subject child returned to their care and custody without further delay.
 The Court conducted an evidentiary hearing which commenced on October 12, 2004 and concluded on October 25, 2004. Both of the Respondents were physically present at each and every stage of the evidentiary hearing. Over the course of the hearing, both testimony and evidentiary material were adduced from witnesses presented by both the Petitioner and by the Respondents. The Court was afforded the opportunity to evaluate the demeanor, veracity and credibility of all of the witnesses and of the evidence proffered.
 In accordance with the provisions of section 4511 of the Civil Practice Laws and Rules and upon the request of the Petitioner, the Court did take judicial notice of all prior proceedings under Suffolk County Family Court docket nos. NN-xxx/2001, NN-xxx/2001, NA-xxx/2001, NA-xxx/2001, NN-xxx/2002, NN-xxx/2002, B-xxx/2002, B-xxx/2002, B-xxx/2002, B-xxx/2002 and B-xxx/2002, each one of which was litigated before the undersigned as presiding judge.
 EVIDENCE ADDUCED AT THE HEARING
 The subject child JUSTINA R. was received into foster care under the auspices of the Petitioner on or about July 5, 2002 when she was approximately 24 hours old in accordance with the provisions of Section 1024 of the Family Court Act. Her placement was thereafter confirmed by an Order of this Court. Since that time, she has been in a pre-adoptive foster home with her two older siblings. The Petitioner's reasons for assuming such foster care were grounded in prior adjudications of the subject child's older siblings Stefanie D. and Christyn D. as abused children (see docket nos. NN-xxx/2001, NN-xxx/2001, NA-xxx/2001 and NA-xxx/2002). The elder siblings were adjudicated to be severely abused children based upon sworn allocutions and admissions by both Respondents that the child Stefanie had sustained multiple rib and skull fractures which would not have occurred in a child that was cared for properly. These admissions were made by both of the Respondents, under oath,
after the commencement of a fact-finding hearing but before the conclusion thereof. Both Respondents were represented by private counsel of their choosing throughout the pendency of those proceedings.
 The Petitioner alleges, in sum and substance, that the Respondents have failed, neglected and refused to comply with this Court's prior and multiple Orders of Fact-Finding & Disposition, Orders Of Suspended Judgment and Permanency Orders, which, inter alia, did require them to visit regularly with the child, to participate in and successfully complete a course of psychotherapy from a provider approved by the Petitioner, to complete parent training programs, to attend planning conferences and for Mr. D. to address his medical issues relative to his alleged intestinal problems which, he asserted, constituted an insurmountable impediment to his compliance with the Court's directives. The Respondents were fully aware of the terms and conditions of each of the Orders issued by this Court, each of them having been represented by counsel at all stages of all of the proceedings before this Court.
 The Petitioner's witness Sally O'Donnell, the County's Foster Care Supervisor, testified that she had been supervising this matter particularly closely because of the fact that there was abuse involved with the older siblings. Her uncontroverted testimony clearly established that she was fully familiar with all of the terms and conditions of the prior Orders of the Court. Ms. O'Donnell readily admitted that Mrs. D. completed two parent training courses (which the agency magnanimously arranged to be conducted at the home of the Respondents), attended planning conferences at the agency and visited regularly but stated that she did not complete a course of psychotherapy. As to Mr. D., she stated that he had completed two parent training courses but did not comply with any of the other terms of the Orders.
 As to the psychotherapy requirement, the Respondents had been seeing Philip Antz MD and then Jerome Abramson CSW until early 2003. They had selected Mr. Abramson from a list of providers who accepted their health insurance and he was initially approved by Petitioner. At some time prior to April of 2003, the County objected to continued therapy with Mr. Abramson and a hearing was
held before this Court at which Mr. Abramson appeared and offered
testimony on behalf of the Respondents. The Respondents, through prior counsel, vociferously insisted upon continuing with Mr.
Abramson but after hearing his testimony together with that of Ann Dalton Morabito CSW (a therapist recommended by the County), the Court was constrained to agree with the Petitioner. [*3]Mrs. D. thereafter attended one visit with Ms. Morabito and adamantly refused to see her again while Mr. D. declined to see her at all. Ms. O'Donnell testified that the Respondents asserted various excuses for their refusal, most prominent among them that Ms. Morabito's office was too geographically distant from their residence (the County's gratuitous and generous offer of full reimbursement for all travel expenses was summarily rejected by the Respondents) and, more importantly, that Ms. Morabito didn't believe the Respondents' claims that they "didn't do anything" to cause injury to Stefanie. Mr. D. claimed an inability to travel at all while Ms. D. told Ms. O'Donnell that Ms. Morabito was a "mean lady and doesn't believe us." The testimony clearly established that the County recommended Ms. Morabito (who, incidentally was one of the participating providers on the Respondents' health insurance plan) due to Mr. and Mrs. D.'s complete lack of progress with Dr. Philip Antz and Mr. Abramson, both of whom were selected by the Respondents and were, at least initially, approved by the County.
 Ms. O'Donnell also testified that Mrs. D. did visit regularly with the child and her siblings at the DSS facility at EquiPark. The visits had initially taken place in the D.'s home but these were suspended by an Order of this Court, after a hearing, due to a plethora of problems occurring between the Respondents, the children and DSS, all of which which were instigated by the Respondents. Mr. D. has failed to visit with the children at all since the situs of visitation was changed to EquiPark, citing an unproven inability to travel. Ms. O'Donnell also testified that both Respondents did complete a parent training course and that only Mrs. D. attended the planning conferences but continued to deny any responsibility.
 The County called Brian Donohue, a CPS worker who testified that he had been charged with transporting the children and supervising visitation at EquiPark since April 30, 2003. He stated that although Mrs. D. regularly saw the children, Mr. D. did not visit at all and, in fact, did not even engage in telephone visitation with the children, although ample opportunity to do so was afforded to him.

 Both Mr. D. and Mrs. D. readily offered testimony on their respective behalves and, not surprisingly, their version of the events was diametrically opposed to that portrayed by the Petitioner's witnesses.
 The Respondent Charlotte D.'s testimony as to the visitation did not differ substantially from that offered by the County. However, her statements diverged wildly from the Petitioner's claims [*4]where the issue of mandated psychotherapy was concerned. She averred that Ms. Morabito spent the entire session making statements to the effect of "What did you do?" and demands such as "If you don't tell me, then I can't help you." She then stated that she subsequently consulted with three other therapists (though when pressed, she could not identify any of them) all of whom either refused to take her as a client or advised her to retain an attorney. She did, however, recall a fourth therapist, Charles Greco, whom DSS declined to approve. She continued by stating that she also communicated with FEGS once weekly for one and one half months as well as Family Counseling Services and Catholic Charities. However, no proof other than her bare testimony was offered in support of these assertions.
 Mrs. D.'s most disturbing testimony came in the form of her verbatim statements that "I didn't do anything so I can't tell her what I did" (referring to her session with Ann Dalton Morabito vis-a-vis the injuries sustained by Stefanie) and "They're looking for an admittance of what I did to Stefanie. I can't do that." These sworn statements cannot be reconciled with the sworn allocution given by the Respondent, with the advice and consent of counsel, in open court on January 4, 2002 in the prior abuse proceedings.
 Although the Mrs. D. once again vociferously insisted that the children were afflicted with osteogenesis imperfecta congenita (brittle bone disease), this assertion has been conclusively disproven by the genetic tests performed upon the children in the prior abuse proceeding (which, incidentally, were completed by one of our nation's foremost experts on that anomaly, Jessica G. Davis M.D., F.A.C.M.G. of the New York-Presbyterian Hospital, that physician having been selected by the Respondents). In addition and most telling, the children have sustained no
fractures whatsoever since the time of their removal from the care and custody of the D.'s. Mrs. D. then attempted to buttress her testimony by cavalierly stating that she had found information "on the internet and from a family in Ohio" about a condition known as "temporary brittle bone disease." However, the Court was provided with nothing that was legally or factually efficacious (in fact, nothing at all) beyond her bare statements that "It's possible for children to have temporary brittle bone disease only during the first six months and never have a fracture again. Their bones can grow stronger."
 The Court next heard from the Respondent Howard D. who offered sworn testimony. He concurred with the statements made by his wife and attributed his difficulties to "intestinal [*5]problems" and a lack of adequate transportation, even going so far to describe his automobile as a "lawn ornament." Indeed, although Mr. D. complains that he is unable to travel any distance from his home due to the advanced state of his alleged but unproven digestive difficulties (he unsuccessfully attempted to employ this excuse in prior proceedings before this Court), his presence in court on each occasion that these matters have appeared on the Court's calendar, sometimes for six hours each day, clearly belie that assertion by him.
 FINDINGS OF FACT & CONCLUSIONS OF LAW
 In order for the County's petitions to be sustained, it must be proven to the Court that at least one of the five criteria set forth in Subdivision 4 of Section 384-b of the Social Services Law is extant. In the case at bar, the County must establish that Justina R. is a permanently neglected child as contemplated by Section 384-b(4)(d) of the Social Services Law. This must be conclusively proven by clear and convincing evidence as required by Social Services Law section 384-b(3)(g)and not by a fair preponderance as is usual in Article 10 proceedings.
 The term "permanently neglected child" is, for the purposes of these proceedings, defined in Section 384-b(7)(a) of the Social Services Law. That section reads, in relevant part, as follows:
 "..."permanently neglected child" shall mean a child
 who is in the care of an authorized agency and whose
 parent or custodian has failed for a period of more
 than one year following the date such child came into
 the care of an authorized agency substantially and
 continuously or repeatedly to maintain contact with
 or plan for the future of the child, although
 physically and financially able to do so, notwith-
 standing the agency's diligent efforts to encourage
 and strengthen the parental relationship, when such
 efforts will not be detrimental to the best interests
[*6] of the child."
 All of the parties concede (and it is beyond any dispute) that Justina R. was born on July 4, 2002, received into the care of the County on July 5, 2002 and has remained in the same foster care placement since that time. The Respondents have never enjoyed physical custody of the child. The County's petitions were filed with the Court on March 5, 2004, some twenty months later. This proceeding, therefore, falls squarely within within the parameters of Social Services Law section 384-b.
 Here, it is uncontroverted that the Respondent Howard D. has failed to exercise any visitation whatsoever with the child since on or about April 30, 2003 and has maintained no telephone or other contact with the child since that time. He has also persistently failed to comply with express directives of this Court's prior orders (save for the parenting courses) and by so doing, has failed to make any plan whatsoever for the child's future as contemplated by the express provisions of the Social Services Law.
 As to the Respondent Charlotte D., it is clear from all of the evidence adduced that she did maintain contact with the child. However, she has continuously failed to plan for the child's future and has persistently refused to engage in psychotherapy, despite this Court's orders to the contrary. She would, however, have this Court believe that her failure to engage in therapy was due solely to the fault of the Petitioner and she attempts to
portray herself and her husband as hapless victims of a cadre of unscrupulous DSS caseworkers and evil psychotherapists. Nothing could be further from the truth.
 In short, both Respondents again impressed the Court, as they have done in the past, as wholly disingenuous and completely unworthy of belief with respect to their proffered testimony. They have been persistently obstinate in their continuing refusal to acknowledge any responsibility whatsoever for any of the problems that have befallen them and their children. They have, instead, stubbornly and adamantly chosen to attribute blame to the Petitioner, the DSS caseworkers, Ms. Dalton Morabito and an alleged genetic condition which has been conclusively ruled out by a genetic expert of their choosing. The Court finds their continuing intransigence to be appalling, unproductive and completely inconsistent with a goal of reunification. More important, their continuing course of conduct is, in this Court's opinion, detrimental to the best interests of the child.
 The Court finds that based upon all of the evidentiary submissions herein, that the County's application pursuant to Family Court Act section 1039-b should be granted. The Court finds that the County has established, by clear and convincing evidence, that it did engage in a continuing course of diligent efforts in order to attempt the strengthen the parental relationship. The Court finds that such efforts are no longer necessary nor would any further efforts be in the best interests of the child.
 In a recent decision, the Appellate Division of the Supreme Court, First Department, ruled that evidence that a parent failed to make sufficient progress in mandated therapy to the extent deemed necessary by the agency would be sufficient grounds to make a finding of permanent neglect. See In Re Christian Lee R.
9 AD3d 275 (App. Div. 1st Dept., 2004). In the case at bar, neither of the Respondents have made so much as a scintilla of progress in mandated therapy over the course of more than two years, clearly supporting a finding of permanent neglect.
 In the matter of In Re Star Leslie W. 63 NY2d 136 (Ct. App., 1984), the New York Court Of Appeals, in a unanimous and scholarly opinion authored by Judge Richard D. Simons, ruled that a determination of permanent neglect would only be sustainable after finding that the parents failed to maintain contact with the child or plan for the child's future, as mandated by Section 384-b of the Social Services Law. The Court of Appeals also opined that "...a default in performing either may support a finding of permanent neglect." The Court of Appeals also decreed that the examination must begin with a determination as to whether the agency exercised diligent efforts to strengthen the parental relationship.
 It is abundantly clear from all of the evidence adduced that in the case of the instant petitions, the County has gone to extraordinary lengths to attempt to strengthen the relationship between the Respondents and their child. The Petitioner has facilitated visitation, has held regular planning conferences to which both Respondents have been invited (although Mrs. D. has attended Mr. D. has declined to do so), has attempted assiduously to facilitate psychotherapy for the D.'s, all in a series of valiant but fruitless attempts to achieve the reunification of the Respondents with their child. By engaging in a continuing course of deliberate and affirmative [*7]conduct, the D.'s have effectively thwarted all of the agency's efforts at reunification.
 The Court's record of these proceedings demonstrates, by clear and convincing evidence, that the Respondents Charlotte D. and Howard D. have permanently neglected their child Justina R. as that term is defined by Social Services Law section 384-b(7)(a), in spite of the Petitioner's diligent efforts at reunification. The Court finds that it would be in the child's best interests to be forthwith freed for adoption.
 Accordingly, it is the determination of this Court that the Petitioner's application shall be and the same is hereby granted in its entirety. The County is hereby relieved of any further diligent efforts to strengthen the parental relationship. The subject child Justina R. is hereby adjudicated to be permanently neglected and the guardianship and custody of this child shall be and is hereby committed to the Commissioner Of The Department Of
Social Services in and for the County Of Suffolk, for the stated purpose of adoption. The parental rights of the Respondents Charlotte D. and Howard D. shall be and the same are hereby terminated in their entirety.
 This shall constitute the decision, judgment and order of this Court.
Dated: 17 November 2004
at Central Islip, New York
 ____________________________________
 HON. JEFFREY ARLEN SPINNER
 Judge, County Court
 Acting Judge, Family Court
*The names and other identifying matters of the parties have been changed in order to protect their privacy.